```
 1  ADAM L. BRAVERMAN
    United States Attorney
 2  BRUCE C. SMITH
    Assistant U.S. Attorney
 3  California State Bar No. 078225
    Federal Office Building
 4  880 Front Street, Room 6293
    San Diego, California 92101-8893
 5  Telephone: (619) 546-8266
    E-mail: bruce.smith@usdoj.gov
 6
    Attorneys for Plaintiff
 7  United States of America
```

8                UNITED STATES DISTRICT COURT

9                SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,        | Case No. **'18CV0351 AJB AGS** |
|----------------------------------|--------------------------------|
|              Plaintiff,          | COMPLAINT FOR FORFEITURE       |
|     v.                           |                                |
| $134,000.00 IN U.S. CURRENCY,    |                                |
|              Defendant.          |                                |

    By way of complaint against the defendant $134,000.00 IN U.S. CURRENCY ("$134,000 in currency"), plaintiff UNITED STATES OF AMERICA alleges:

    1. This Court has jurisdiction over this action by virtue of the provisions of Title 28, United States Code, Section 1355(a) and Title 21, United States Code, Section 881(a)(6), because the defendant $134,000 in currency constitutes money furnished or intended to be furnished in exchange for a controlled substance, or proceeds traceable to an exchange for controlled substances in violation of Chapter 13 of Title 21, United States Code.

    2. Venue is proper in this district pursuant to

//

USAO:201800032:BCS/bfs

Title 28, United States Code, Section 1395 because the defendant $134,000 in currency was found in this district.

3. On October 13, 2017, in the Southern District of California, at the San Diego International Airport ("SDIA"), members of the San Diego Integrated Narcotics Task Force ("NTF") Commercial Interdiction Unit were on duty, seeking to intercept and seize controlled substances and proceeds from the sales of controlled substances passing though the airport.

   A. The Task Force officers ("TFO") were trained and experienced, and knew that persons engaged in the commercial interstate distribution of controlled substances frequently used SDIA and the aircraft that arrived and departed there to distribute controlled substances throughout the United States.

   B. The Task Force officers were trained and experienced, and knew that persons engaged in the commercial interstate distribution of controlled substances frequently used SDIA and the aircraft that arrived and departed there to transport drug sales proceeds and funds to be used to purchase drugs in and out of San Diego. Those proceeds and funds were usually in the form of United States currency.

   C. The Task Force officers were trained and experienced, and knew that persons engaged in the commercial interstate distribution of controlled substances frequently used couriers to transport controlled substances, drug sales proceeds, and funds to be used to purchase drugs in and out of San Diego. SDIA and the aircraft that arrived and departed

there are relied upon as a means of sending and receiving such couriers.

4. On or about October 13, 2017, NTF Task Force officers and Drug Enforcement Administration ("DEA") agents assigned to NTF Team 8 at SDIA learned that JOSHUA WILSON ("WILSON") was traveling from Charleston International Airport ("CHS") in Charleston, South Carolina to SDIA aboard Delta Airlines flight 1430.

    A. WILSON was traveling from CHS to SDIA on a one-way ticket, purchased within 24 hours of the scheduled departure time for the flight.

    B. WILSON, a resident of Johns Island, South Carolina, did not purchase a ticket for a return flight.

    C. The Task Force officers learned WILSON was flying with no checked luggage.

    D. The TFOs and DEA agents had specialized training and were experienced in investigating illegal drug and drug currency couriers. They knew the purchase of a cross-country, one-way airline flight ticket less than 24 hours before departure is unusual, and can be indicative the traveler is an illegal drug or drug currency courier.

    E. The TFOs and DEA agents knew the general traveling public will purchase round-trip airline tickets weeks or even months in advance of the scheduled departure date.

    F. An advance round-trip ticket purchase results in lower fares for the traveler. Purchasing an airline ticket //

even a week in advance of departure all but guarantees one will pay the highest fare.

  G. The TFOs and DEA agents had specialized training and were experienced in investigating illegal drug and drug currency couriers.  They knew illegal drug and drug currency couriers often times do not know when drugs or currency will be available for transport until the last minute.  The nature of illegal drug trafficking, and its uncertainties, often compels couriers and their employers to purchase airline tickets close to the departure date.

  H. The TFOs and DEA agents were trained and experienced, and knew that the Southern District of California is a primary source region for controlled substances cultivated and manufactured on the west coast of the United States ("west coast"), Latin America, and elsewhere.

  I. The TFOs and DEA agents were trained and experienced, and knew that controlled substances cultivated and manufactured on the west coast, in Latin America, and elsewhere were sent and distributed for resale from source regions such as San Diego to all points north and east within the United States.  In their experience, the South Carolina region was a known destination market for controlled substances.

 5. The TFOs and DEA agents researched WILSON's criminal history.

  A. WILSON had a history of arrests in the states of South Carolina, Florida, and Indiana.

B. WILSON was arrested in 2003 for felony possession of a controlled substance in Cocoa Beach Florida, and was convicted in 2004.

C. In June of 2016, in Charleston, South Carolina, an inspector for U.S. Postal Inspector Service, working with Charleston County Sheriff's deputies, intercepted and seized a parcel containing a commercial amount of expensive, high grade, bud marijuana, a Schedule I Controlled Substance, shipped to WILSON by an unknown individual in Capitola, California.

6. On October 13, 2017, just before 1:00 p.m. in SDIA Terminal Two, gate 47, the TFOs and DEA agents prepared for the arrival of Delta Airlines flight 1430 and passenger WILSON.

7. At approximately 1:06 p.m., shortly after Delta Airlines flight 1430 landed, the TFOs and DEA agents, armed with a physical description of WILSON, located him as he exited the jet way from Gate 47 and walked into the terminal.

8. Special Agent ("SA") Sharpe and TFO Loochkartt walked up to WILSON, identified themselves as law enforcement officers, and showed WILSON their respective credentials.

A. SA Sharpe assured WILSON he was not in trouble, and asked to speak with WILSON about his travels.

B. WILSON told SA Sharpe he flew from South Carolina to San Diego.

C. WILSON falsely told SA Sharpe he lived in San Diego.

//

      D.    WILSON falsely told SA Sharpe he traveled from his home in San Diego to South Carolina to visit his children.

   9. SA Sharpe asked WILSON for permission to search the contents and interior spaces of WILSON'S carry-on bag.

      A.    WILSON granted consent to examine his carry-on bag, and handed it to TFO Loochkartt.

   10. While examining the contents of WILSON'S carry-on bag, TFO Loochkartt discovered a large amount of U.S. currency at the bottom of the bag.

      A.    WILSON told SA Sharpe he was carrying $125,000.00 in cash.

      B.    WILSON later told SA Sharpe he counted the currency he had in his carry-on bag, and knew it was over $130,000.00, but did not know the exact amount.

      C.    The TFOs and DEA agents were trained and experienced, and knew that it is common for drug currency couriers not to know the dollar amount of money they are transporting.

      D.    The TFOs and DEA agents were trained and experienced, and knew drug currency couriers do not own the money they are transporting.

      E.    The TFOs and DEA agents were trained and experienced, and knew drug currency couriers are typically hired to perform a discreet task. They are given an amount of currency and a set of instructions relative to their journey. They are told where to take the money, how to get there, and how or to whom it is to be delivered. They are

//

not, however, always told the dollar amount of the currency they are transporting.

  F. The TFOs and DEA agents were trained and experienced, and knew it is common for drug currency couriers, when contacted by law enforcement, to understate the amount of money they are transporting.

11. WILSON agreed to accompany the officers to the nearby SDIA NTF office, where the contents of WILSON'S bag could be examined in privacy.

  A. SA Sharpe repeated to WILSON that he was not under arrest, and was free to leave.

  B. WILSON walked with SA Sharpe and TFO Loochkartt to the nearby SDIA NTF office.

  C. As they walked to the SDIA NTF office, WILSON told SA Sharpe he worked as a freelance surf instructor.

12. After arriving at the NTF office, SA Sharpe again told WILSON he was not under arrest and he was free to leave.

  A. WILSON again expressed consent for TFOs and DEA agents to search WILSON'S carry-on bag.

  B. WILSON was in close proximity to his carry-on bag, and watched as the TFOs removed bundles of currency from the bag.

13. The currency discovered in WILSON'S carry-on bag was divided or segregated into four (4) separate units.

  A. Some of the currency was wrapped in rubber bands, some was wrapped in bank straps or bands, and some was in white paper Wells Fargo Bank envelopes.

//

  B. WILSON told SA Sharpe his carry-on bag contained $125,000.00.

14. WILSON gave conflicting, nonsensical stories about why he was transporting such a large amount of currency to San Diego, and what he planned to do with it.

15. WILSON gave SA Sharpe consent to examine the contents of the two (2) cellular telephones WILSON was carrying.

  A. TFO Santana unlocked both phones, using the passwords provided by WILSON.

  B. TFO Santana discovered multiple text messages in WILSON'S cell phones TFO Santana immediately recognized as messages discussing narcotics transactions and photographic images of marijuana.

  C. TFO Santana encountered a photographic image of a multi-ounce quantity of an off-white colored powder.

  D. WILSON identified the powder in the photo as fentanyl, a controlled substance.

16. Among WILSON'S possessions, the TFOs discovered written notes, the trained and experienced TFOs immediately recognized as drug price lists and drug sales ledgers or "pay and owe" sheets.

17. The currency concealed in WILSON'S carry-on bag was combined, counted, and determined to have a dollar value of $134,000.00, not $125,000.00 or $130,000.00 as stated earlier by WILSON.

18. The currency concealed in WILSON'S carry-on bag is the defendant $134,000 in currency.

//

19. The defendant $134,000 in currency was made up of 1,796 bills, in three (3) different denominations.

    A.    The defendant $134,000 in currency consisted of 920 $100.00 bills, 836 $50.00 bills, and 40 $5.00 bills.

20. Among WILSON'S possessions were two (2) receipts from two (2) different Wells Fargo Bank branches, both dated October 12, 2017, the day before WILSON flew to SDIA from CHS.

    A.    The first Wells Fargo Bank receipt was time-stamped 12:37 p.m., and memorialized the deposit of $4,000.00 in $20.00 bills into a bank account number ending in "5431."

    B.    The second Well Fargo Bank receipt was time-stamped 3:08 p.m., and memorialized the submission of $30,000.00 in miscellaneous loose currency in exchange for $30,000.00 in $100.00 bills.

    C.    The two (2) transactions involved the deposit or submission for change of $29,000.00 in $20.00 bills in a single day.

21. The TFOs and DEA agents had specialized training and were experienced in investigating illegal drug traffickers and drug currency couriers. They knew illegal street drug sales were virtually always conducted as an exchange of drugs for currency.

    A.    The most common denomination used in illegal street drug transactions was the $20.00 bill.

    B.    Only hours before his flight, WILSON submitted, or caused to be submitted, $29,000.00 in $20.00 bills to two (2) separate Wells Fargo Bank branches.

//

   C. Only hours before his flight, WILSON converted, or caused to be converted, at least $25,000.00 of the defendant $134,000.00 from $20.00 bills to $100.00 bills.

  22. The TFOs and DEA agents had specialized training and were experienced in investigating illegal drug traffickers and drug currency couriers. They knew illegal drug traffickers and drug currency couriers would sometimes exchange their drug-contaminated currency at a bank for "clean" currency, not contaminated by controlled substances.

   A. Illegal drug traffickers and drug currency couriers knew law enforcement frequently used drug detection canines to examine currency encountered in the field.

   B. By exchanging their drug-contaminated currency for clean currency from a bank, the illegal drug traffickers and drug currency couriers hoped to defeat law enforcement's drug detection canines.

  23. The defendant $134,000 in currency was seized for forfeiture by the DEA as currency constituting proceeds of the purchase(s) of controlled substances, and money possessed with the intent to be furnished in exchange for controlled substances.

  24. During the subsequent investigation of WILSON and the defendant $134,000 in currency, the SDIA TFOs and DEA agents learned that on January 4, 2018, in Morgan County, Indiana, WILSON and an adult female resident of Temecula, California, were encountered by officers of the Indiana State Police while WILSON and the woman were traveling in a rented box truck containing, among other things, hundreds of pounds

of expensive bud marijuana, a Schedule I Controlled Substance.

    A. WILSON told the Indiana State Police officers the truck contained between 200 and 300 pounds of marijuana.

    B. The Indiana State Police officers discovered and seized approximately 240 pounds of expensive, high-grade bud marijuana aboard the truck.

    C. WILSON told the Indiana State Police officers the marijuana in the truck belonged to him, and that WILSON was being paid by an unnamed individual to transport the marijuana from California to New Jersey.

    D. WILSON told the Indiana State Police officers he loaded the marijuana into the truck.

    E. WILSON was arrested by the Indiana State Police officers for dealing in marijuana, a felony.

25. As a result of the January 4, 2018 arrest, WILSON was charged before the Morgan Circuit/Superior Court, in the matter of <u>State of Indiana v. Joshua W. Wilson</u>, 55C01-1801-F5-000060, with dealing in marijuana, a felony.

    A. That case is pending before the Morgan Circuit/Superior Court.

26. The defendant $134,000 in currency constitutes money furnished or intended to be furnished in exchange for a controlled substance, in violation of Chapter 13, Title 21, United States Code.

27. Alternatively, the defendant $134,000 in currency constitutes proceeds of, or proceeds traceable to, an

//

exchange for a controlled substance, in violation of Chapter 13, Title 21, United States Code.

28. Alternatively, the defendant $134,000 in currency was used or intended to be used to facilitate an exchange for a controlled substance, in violation of Chapter 13, Title 21, United States Code.

29. As a result of the foregoing, the defendant $134,000 in currency is liable to condemnation and to forfeiture to the United States for its use in accordance with Title 21, United States Code, §881(a)(6).

30. The defendant $134,000 in currency is presently deposited within the jurisdiction of this Court.

WHEREFORE, the United States prays that due process issue to enforce the forfeiture of the defendant $134,000 in currency, and that due notice be given to all interested parties to appear and show cause why said forfeiture should not be declared.

DATED: February 14, 2018

ADAM L. BRAVERMAN
United States Attorney

s/ Bruce C. Smith
BRUCE C. SMITH
Assistant U.S. Attorney

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
United States of America

## DEFENDANTS
$134,000.00 in U.S. Currency

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
AUSA Bruce C. Smith, Phone: (619) 546-8266
USAO, 880 Front Street, Room 6293, San Diego, CA 92101-8893

Attorneys (If Known)

**'18CV0351 AJB AGS**

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)
- [X] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated or Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| 110 Insurance | PERSONAL INJURY / PERSONAL INJURY | 610 Agriculture | 422 Appeal 28 USC 158 | 400 State Reapportionment |
| 120 Marine | 310 Airplane / 362 Personal Injury - Med. Malpractice | 620 Other Food & Drug | 423 Withdrawal 28 USC 157 | 410 Antitrust |
| 130 Miller Act | 315 Airplane Product Liability / 365 Personal Injury - Product Liability | [X] 625 Drug Related Seizure of Property 21 USC 881 | | 430 Banks and Banking |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander / 368 Asbestos Personal Injury Product Liability | 630 Liquor Laws | PROPERTY RIGHTS | 450 Commerce |
| 150 Recovery of Overpayment & Enforcement of Judgment | 330 Federal Employers' Liability | 640 R.R. & Truck | 820 Copyrights | 460 Deportation |
| 151 Medicare Act | 340 Marine / PERSONAL PROPERTY | 650 Airline Regs. | 830 Patent | 470 Racketeer Influenced and Corrupt Organizations |
| 152 Recovery of Defaulted Student Loans (Excl. Veterans) | 345 Marine Product Liability / 370 Other Fraud | 660 Occupational Safety/Health | 840 Trademark | 480 Consumer Credit |
| 153 Recovery of Overpayment of Veteran's Benefits | 350 Motor Vehicle / 371 Truth in Lending | 690 Other | | 490 Cable/Sat TV |
| 160 Stockholders' Suits | 355 Motor Vehicle Product Liability / 380 Other Personal Property Damage | LABOR | SOCIAL SECURITY | 810 Selective Service |
| 190 Other Contract | 360 Other Personal Injury / 385 Property Damage Product Liability | 710 Fair Labor Standards Act | 861 HIA (1395ff) | 850 Securities/Commodities/ Exchange |
| 195 Contract Product Liability | | 720 Labor/Mgmt. Relations | 862 Black Lung (923) | 875 Customer Challenge 12 USC 3410 |
| 196 Franchise | | 730 Labor/Mgmt.Reporting & Disclosure Act | 863 DIWC/DIWW (405(g)) | 890 Other Statutory Actions |
| REAL PROPERTY | CIVIL RIGHTS / PRISONER PETITIONS | 740 Railway Labor Act | 864 SSID Title XVI | 891 Agricultural Acts |
| 210 Land Condemnation | 441 Voting / 510 Motions to Vacate Sentence | 790 Other Labor Litigation | 865 RSI (405(g)) | 892 Economic Stabilization Act |
| 220 Foreclosure | 442 Employment | 791 Empl. Ret. Inc. Security Act | FEDERAL TAX SUITS | 893 Environmental Matters |
| 230 Rent Lease & Ejectment | 443 Housing/ Accommodations / Habeas Corpus: | | 870 Taxes (U.S. Plaintiff or Defendant) | 894 Energy Allocation Act |
| 240 Torts to Land | 444 Welfare / 530 General | | 871 IRS—Third Party 26 USC 7609 | 895 Freedom of Information Act |
| 245 Tort Product Liability | 445 Amer. w/Disabilities - Employment / 535 Death Penalty | IMMIGRATION | | 900 Appeal of Fee Determination Under Equal Access to Justice |
| 290 All Other Real Property | 446 Amer. w/Disabilities - Other / 540 Mandamus & Other | 462 Naturalization Application | | 950 Constitutionality of State Statutes |
| | 440 Other Civil Rights / 550 Civil Rights | 463 Habeas Corpus - Alien Detainee | | |
| | 555 Prison Condition | 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)
- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
21 U.S.C. Section 881
Brief description of cause:
Narcotics trafficking

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [X] No

## VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE: 02/14/2018
SIGNATURE OF ATTORNEY OF RECORD: s/ Bruce C. Smith

**FOR OFFICE USE ONLY**
RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## VERIFICATION

I, Kevin Sharpe, state and declare as follows:

1. I am a special agent with the Drug Enforcement Administration, assigned to San Diego Integrated Narcotics Task Force Team 8, and am one of the task force officers assigned to this investigation.

2. I have read the foregoing complaint and know its contents.

3. The facts set forth in the complaint are based upon my own knowledge or were facts furnished to me by other United States federal, state, or local law enforcement personnel, civilian witnesses, or other official Government sources.

Based on this information, I believe the allegations in the complaint to be true.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief.

Executed on February 14, 2018.

_____
KEVIN SHARPE, SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION